# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

KERMIT FRANCIS,
    Petitioner,

    v.

COMMISSIONER OF CORRECTION, et
al.,[1]
    Respondents.

No. 3:18-cv-847 (SRU)

## **ORDER**

In this remanded habeas action, the Commissioner of Correction (the "Commissioner")

asks me to dismiss Kermit Francis's petition for a writ of habeas corpus, brought pursuant to 28

U.S.C. § 2254.  Francis is currently serving a 60-year sentence in state custody for his 1996

convictions for murder and carrying a pistol without a permit.

In March 2019, I granted the Commissioner's motion to dismiss Francis's petition as

untimely.  *See* Ruling, Doc. No. 34.  But I also issued a certificate of appealability because this

case presented a close question.  More specifically, my ruling relied on my conclusion that the

Connecticut Supreme Court's reversal of Francis's third count of conviction—for altering or

---

[1]    Francis listed two respondents on his *pro se* habeas petition:  (1) the Commissioner of Correction, and (2) "Warden Mulligan."  *See* Compl., Doc. No. 1, at 1.  "Warden Mulligan" appears to be William Mulligan, who was the Warden at MacDougall-Walker Correctional Institution ("MacDougall-Walker") from 2017 to 2019.  *See MacDougall-Walker Corr. Inst.*, CONN. ST. DEP'T OF CORR., https://portal.ct.gov/DOC/Facility/MacDougall-Walker-CI (last visited Aug. 25, 2021).  Apparently, Francis was housed at MacDougall-Walker in 2018, when he filed this petition.  *See id.* (listing MacDougall-Walker's address as 1183 East St. South, Suffield, CT 06080); Compl., Doc. No. 1, at 1 (Francis listing the same address as his own address).

    However, when Attorney Sulik from the Office of the State's Attorney filed an appearance, she did so only on behalf of the Commissioner of Correction.  *See* Notice of Appearance, Doc. No. 7.  So, no one has ever filed an appearance on behalf of Warden Mulligan.  As a formal matter, Warden Mulligan was likely the correct respondent. *See* Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts, available at https://www.uscourts.gov/sites/default/files/rules_governing_section_2254_and_2255_cases_in_the_u.s._district_courts_-_dec_1_2019.pdf (last accessed Aug. 25, 2021); *see also Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004). (Now, the correct respondent would be Kristine Barone, who is the current Warden at MacDougall-Walker.  *See MacDougall-Walker Corr. Inst.*, CONN. ST. DEP'T OF CORR., https://portal.ct.gov/DOC/Facility/MacDougall-Walker-CI (last visited Aug. 25, 2021).)  Because neither party raises this issue, and because I dismiss Francis's petition, I need not address it further.

removing an identification mark on a pistol—resulted in a remand for a purely ministerial

purpose.  In September 2020, the Second Circuit vacated the judgment I had entered in favor of

the Commissioner and remanded based on its view that this case could be resolved on simpler

grounds with further factfinding.

Following the remand, I appointed *pro bono* counsel for Francis, and, in May 2021, the

Commissioner filed a renewed motion to dismiss based on the untimeliness of Francis's petition.

After full briefing and an oral argument, the motion—which I treat as a motion for summary

judgment, as described below—is now ripe for decision.  Because Francis's petition is untimely,

I **grant** the Commissioner's motion to dismiss.

## I.      Standard of Review

### A.      AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "restricts the

ability of prisoners to seek federal review of their state criminal convictions."  *Smith v.*

*McGinnis*, 208 F.3d 13, 15 (2d Cir. 2000).  AEDPA provides a one-year statute of limitations for

federal habeas actions filed by prisoners in custody pursuant to a state court judgment.  *See* 28

U.S.C. § 2244(d)(1); *Murphy v. Strack*, 9 F. App'x 71, 72 (2d Cir. 2001).  As relevant here,

AEDPA's one-year limitations period runs from "the date on which the judgment became final

by the conclusion of direct review or the expiration of the time for seeking such review."  28

U.S.C. § 2241(d)(1)(A).

AEDPA's one-year statute of limitations is tolled for "[t]he time during which a properly

filed application for State post-conviction or other collateral review with respect to the pertinent

judgment or claim is pending."  *Id.* § 2244(d)(2); *see also McGinnis*, 208 F.3d at 17.  When the

state post-conviction review terminates, the "clock restarts" and the limitation period resumes.

*Holland v. Florida*, 560 U.S. 631, 638 (2010) (citing *Coates v. Byrd*, 211 F.3d 1225 (11th Cir.

2000)).  As discussed further below, section 2244(d) "is subject to equitable tolling."  *Id.* at 649.

      B.    <u>Conversion Into Motion For Summary Judgment</u>

In its renewed motion to dismiss, doc. no. 62, the Commissioner does not cite Rule 12.

Instead, the Commissioner simply cites to AEDPA's one-year statute of limitations as the basis

for its "motion to dismiss."  *See* Comm'rs Mot. to Dismiss, Doc. No. 62, at 1 (citing 28 U.S.C. §

2244(d)(1)).  As a formal matter, it seems likely that the Commissioner's "motion to dismiss" is

actually an "answer" to Francis's habeas petition.  *See* Rule 5 of the Rules Governing Section

2254 Cases in the United States District Courts, available at

https://www.uscourts.gov/sites/default/files/rules_governing_section_2254_and_2255_cases_in_

the_u.s._district_courts_-_dec_1_2019.pdf (last accessed Aug. 25, 2021).  In any event, I treat

the Commissioner's filing as a motion to dismiss Francis's habeas petition for failure to state a

claim pursuant to Fed. R. Civ. P. 12(b)(6).[2]

"If, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to

and not excluded by the court, the motion must be treated as one for summary judgment under

Rule 56."  Fed. R. Civ. P. 12(d).  To be sure, in evaluating a motion to dismiss, I may—without

converting the motion into a motion for summary judgment—consider documents attached to,

incorporated by reference in, or integral to the complaint and those matters properly subject to

judicial notice.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002).

However, in connection with this motion to dismiss, both parties have presented materials

beyond the pleadings.  Most notably, in opposition to the Commissioner's motion to dismiss,

---

[2]      In my view, it is proper for me to do so under the Federal Rules of Civil Procedure and the Rules
Governing Section 2254 Cases in the United States District Courts.  *See* Fed. R. Civ. P. 81(a)(4)(A); Rule 12 of the
Rules Governing Section 2254 Cases in the United States District Courts, available at
https://www.uscourts.gov/sites/default/files/rules_governing_section_2254_and_2255_cases_in_the_u.s._district_co
urts_-_dec_1_2019.pdf (last accessed Aug. 25, 2021); *Adams v. Greiner*, 272 F. Supp. 2d 269, 271 (S.D.N.Y. 2003).

Francis submitted a sworn declaration.  *See* Decl. of K. Francis in Supp. Opp'n to Comm'rs

Renewed Mot. to Dismiss, Doc. No. 65-1.  Thus, in my view, I must convert the Commissioner's

motion to dismiss into a motion for summary judgment.  When a court makes that conversion,

"[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to

the motion."  Fed. R. Civ. P. 12(d).  In this case, at the August 19 hearing on the Commissioner's

motion to dismiss, the parties consented to my treating the Commissioner's motion to dismiss as

a motion for summary judgment and confirmed that they have presented all the material that they

wish to present.

Because I treat the Commissioner's motion to dismiss as a motion for summary

judgment, the Commissioner can prevail only if the record demonstrates that "there is no genuine

dispute as to any material fact" and that the Commissioner "is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57

(1986).  When ruling on a summary judgment motion, the court must construe the facts of record

in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all

reasonable inferences against the moving party.  *See Anderson*, 477 U.S. at 255.  Thus, I view

the record in the light most favorable to Francis and draw all reasonable inferences in his favor.

## II.    **Background**

### A.    Factual Background

In considering Francis's direct appeal in 1998, the Connecticut Supreme Court articulated

the facts that a "jury reasonably could have found" in this case:

> On December 20, 1993, the defendant, along with Casey Wilcox, Andre Shirley
> and Corey Rosemond, were selling crack cocaine in the area of Wilcox's
> residence at 88 Atwood Street in Hartford.  The victim, Moses Barber, Jr., a
> regular customer, purchased drugs from the defendant.  After making his
> purchase, he walked away.  The victim later returned to Wilcox's porch and
> engaged in an argument with the defendant concerning the drug sale.  The victim

and the defendant left the porch and the defendant proceeded up a dark driveway between two buildings directly across the street from Wilcox's residence. The victim remained near the street. As they continued to argue, the defendant approached the victim and shot him. The victim died later that night as a result of a gunshot wound to his abdomen.

On December 21, 1993, Wilcox asked the defendant for his guns for the purpose of threatening an individual who had accused Wilcox of shooting the victim. The defendant went into the basement of a house on Atwood Street, and emerged with a handgun and rifle, which he gave to Wilcox. Wilcox, in turn, gave the weapons to Rosemond and instructed Rosemond to put the weapons in the trunk of a vehicle parked behind Wilcox's residence. The next morning, Hartford police officers, armed with a search warrant, seized the weapons from the trunk of the vehicle and, thereafter, learned that the defendant did not have a permit to carry a pistol or revolver. Moreover, the police officers found that the serial number on the pistol had been ground off.

Thereafter, Wilcox, Shirley and Rosemond gave statements implicating the defendant in the murder, and a warrant was issued on December 23, 1993, for the defendant's arrest. The defendant was arrested in New York in June, 1995.

*State v. Francis*, 246 Conn. 339, 342–43 (1998).

B.     Procedural Background

In October 1996, Francis stood trial in Connecticut Superior Court for (1) murder, in

violation of Conn. Gen. Stat. § 53a-54a, (2) carrying a pistol without a permit, in violation of

Conn. Gen. Stat. § 29-35, and (3) altering or removing an identification mark on a pistol, in

violation of Conn. Gen. Stat. § 29-36. *See* Direct Appeal Record, App'x A to Comm'rs First

Mot. to Dismiss, Doc. No. 18-3 ("Direct Appeal Record"), at 4–9 (criminal docket sheet,

information, and judgment).[3]  At trial, Francis was represented by Attorney William Collins. *See*

*id.* at 10 (appeal form). The jury found Francis guilty on all three counts. *See id.* at 8

(judgment). And so, on December 23, the state trial court entered judgment against Francis and

sentenced him to a total effective sentence of 60 years' imprisonment: 60 years for the murder

---

[3]       Rather than re-submitting the voluminous record in this case, the Commissioner asks that I take notice of the appendices attached to its first motion to dismiss. *See* Comm'rs Renewed Mot. to Dismiss, Doc. No. 62, at 1.

conviction and concurrent five-year sentences for each firearm conviction.  *See id.* at 8–9 (judgment).

Just days later (on December 27), Francis timely filed an application for sentence review with the Sentencing Review Division of the Connecticut Superior Court (the "SRD").  *See* Sentencing Review Decision, App'x G to Comm'rs First Mot. to Dismiss ("SRD Decision"), Doc. No. 18-9, at 3.  In February 1997, Francis also timely filed a direct appeal to the Connecticut Supreme Court.  *See* Direct Appeal Record, Doc. No. 18-3, at 10–17 (appeal forms); *see also* Conn. Gen. Stat. § 51-199(b) (allowing appeal directly to Connecticut Supreme Court in certain instances).  In that direct appeal, Francis was represented by assistant public defender Mark Rademacher.  *See* Direct Appeal Record, Doc. No. 18-3, at 10 (appeal form).  On August 18, 1998, the Connecticut Supreme Court affirmed Francis's convictions for murder and carrying a pistol without a permit but reversed and remanded for a new trial his conviction for altering firearm identification marks.  *See Francis*, 246 Conn. at 359.  I will refer to the remanded count as the "Firearm Alteration Count."  Francis did not file a petition for certiorari in the United States Supreme Court.

The events immediately following the Connecticut Supreme Court's August 1998 decision have been clarified following the Second Circuit's remand.  On September 4, 1998, the Superior Court held a hearing at which the Firearm Alteration Count was dismissed and Francis was resentenced.  I will refer to that hearing as the "September 1998 Hearing."  Francis was present at the September 1998 Hearing.  The following colloquy occurred there:

> ATTY. O'CONNOR:[4]          As Your Honor does recall, the Supreme Court recently affirmed in part Mr. Francis' convictions for two of three counts in the Information.  Attorney

---

[4]          Attorney O'Connor was the state's attorney.

|  | Bill Collins was the special public defender at the trial.  His son, Attorney Matt Collins, is here.[5] |
|---|---|
|  | The count that was reversed and sent back for a new trial was altering the ID of a pistol . . . . |
|  | Judge Barry, at time of sentencing, imposed sixty years, five years and five years concurrent to each; total effective sentence of sixty years.  So this is a pyrrhic victory at best for the defendant. |
|  | In light of that, I'm going to enter a nolle as to the count for which the new trial order entered, a pistol with an altered ID. |
| THE COURT: | Counsel, anything? |
| ATTY. COLLINS: | May the matter be dismissed? |
| ATTY. O'CONNOR: | The count. |
| ATTY COLLINS: | The count. |
| THE COURT: | Yes, that count may be dismissed. |
| ATTY. O'CONNOR: | So that what remains in effect is the murder – |
| THE COURT: | What remains in effect is the murder conviction and the pistol without a permit – |
| ATTY. O'CONNOR: | Pistol without a permit. |
| THE COURT: | – and the sentence of sixty years, I believe. |
| ATTY. O'CONNOR: | Yes.  Sixty and five concurrent; total effective sentence of sixty years. |
| THE COURT: | Okay.  Thank you, Mr. Francis. |

Hr'g Tr., App'x Y to Comm'rs Renewed Mot. to Dismiss ("Sept. 1998 Hr'g Tr."), Doc. No. 62-

1, at 2–3.  Court records post-dating the September 1998 Hearing confirm that the Firearm

Alteration Count was dismissed on September 4, 1998.  *See* Court Records, App'x Z to Comm'rs

---

[5]      In his opposition to the Commissioner's renewed motion to dismiss, Francis cries foul regarding Attorney Matthew Collins' representation of him at the September 4 Hearing.  I discuss that issue further below.

Renewed Mot. to Dismiss ("Court Records"), Doc. No. 62-2, at 1 (docket sheet noting that, on

September 4, 1998, "3RD COUNT ONLY <u>DISMISSED</u>"); 14 ("revised mittimus as to count

three," issued on September 25, 1998, indicating that "THIRD COUNT DISMISSED ON

9/4/98").

On December 2, 1998,[6] the Sentence Review Division affirmed Francis's sentence.  *See*

SRD Decision, Doc. No. 18-9; *State v. Francis*, 1998 WL 867260, at *2 (Conn. Super. Ct. Dec.

2, 1998).

There is very little information in the record regarding the time between December 2,

1998 and January 10, 2000.  All of that information comes from a declaration that Francis

submitted to support his opposition to the Commissioner's renewed motion to dismiss.  *See* Decl.

of K. Francis in Supp. Opp'n to Comm'rs Renewed Mot. to Dismiss ("Francis's Decl."), Doc.

No. 65-1.  Francis claims that "[a]t some point during 1999, while I was confined [at]

MacDougall-Walker Correctional Institution . . . , I was informed by another inmate that I

needed to file an action challenging my conviction before the time to do so ran out."  *Id.* at ¶ 9.

Francis claims that, "[u]pon learning this information, I acted as diligently as I could" and

"contacted Attorney Frank Cannatelli in 1999."  *Id.* at ¶ 10.  Although Francis does not elaborate

regarding when in 1999 he contacted Attorney Cannatelli, in a brief submitted in support of his

second habeas petition, Francis noted that "[s]ometime in late February of 1999" he "retained

Attorney Frank Cannatelli to represent him with respect to post conviction matters."  Francis's

Br. in Supp. Second Habeas Pet., Ex. C to Francis's Opp'n ("Francis's Second Habeas Br."),

Doc. No. 65-3, at 4.  In addition, in his opposition to the motion to dismiss, Francis writes that

January 10, 2000 was "nearly 11 months after Francis had initially contacted" Attorney

---

[6]      Although the SRD apparently *decided* to affirm Francis's sentence on October 27, 1998, it did not file its
decision until December 2, 1998.  *See* SRD Decision, Doc. No. 18-9, at 3 (indicating that "Date of Decision" was
October 27, 1998).

Cannatelli.  *See* Francis's Opp'n, Doc. No. 65, at 9.  Therefore, based on Francis's own submissions, I conclude that Francis contacted Attorney Cannatelli in late February 1999. Because the calculation of days is important to this case, I assume for purposes of this ruling that "late February 1999" means February 28, 1999.[7]

When they spoke, Francis "instructed Attorney Cannatelli to file an action as soon as possible and to not let the time run out."  Francis's Decl., Doc. No. 65-1, at ¶ 10.  "Attorney Canntelli told me not to worry about it, and that he would file an action in time to 'stop the clock.'"  *Id.*  According to Francis, Attorney Cannatelli "went to my mother's house to pick up the money she had offered to pay on my behalf for an attorney."  *Id.* at ¶ 11.  Francis swears that "[d]uring this period of time, I relied exclusively on Attorney Cannatelli to give me correct legal advice and to protect my rights."  *Id.* at ¶ 14.

Attorney Cannatelli did not file Francis's first application for post-conviction review until January 10, 2000, when he filed a petition for a new trial pursuant to Conn. Gen. Stat. § 52-270. *See* Pet. for New Trial, App'x H to Comm'rs First Mot. to Dismiss, Doc. No. 18-10.  On October 16, a Superior Court judge entered judgment against Francis based on an oral ruling.  *See* Appeal Forms, App'x I to Comm'rs First Mot. to Dismiss, Doc. No. 18-11.  Francis (through Attorney Cannatelli) appealed that ruling.  *See* Appellate Br., App'x J to Comm'rs First Mot. to Dismiss, Doc. No. 18-12.  On March 21, 2001, the Connecticut Appellate Court granted the State of Connecticut's motion to dismiss Francis's appeal.  *See* Docket Record, App'x K to Comm'rs First Mot. to Dismiss, Doc. No. 18-13.

On January 1, 2001—while his appeal regarding his petition for a new trial was pending—Francis, proceeding *pro se*, filed his first habeas action in state court, claiming that his

---

[7]      As described below, that assumption is most generous to Francis because it means that, per my calculation, the AEDPA clock started to run at the latest possible time in "late February 1999."

trial counsel, Attorney William Collins, had been ineffective.  *See Francis v. Comm'r of Corr.*, 182 Conn. App. 647, 650 (2018).  Attorney Cannatelli was appointed to represent Francis in his habeas action, and, in late August 2002, Attorney Cannatelli filed an amended petition on Francis's behalf.  *See* Am. Pet., App'x L to Comm'rs First Mot. to Dismiss, Doc. No. 18-14.  That habeas petition focused on Attorney William Collins' alleged failures to investigate and the State's failure to disclose *Brady* material—in particular, the alleged fact that one of the State's trial witnesses (Corey Rosemond) was a confidential informant for the State in Francis's case.  *See id.*

Apparently, "[a]long with the amended petition, Cannatelli filed a 'Motion for In-Camera Inspection to Determine Identity of Relevant Informant or other Preliminary Relief.'"  *Francis v. Warden*, 2008 WL 1914442, at *1 (Conn. Super. Ct. Apr. 15, 2008).  On November 14, 2002, the state habeas court held a hearing on Francis's motion.  *See id.*  Francis was present that day.  *See id.*  After discussion with Francis, Attorney Cannatelli adopted a litigation strategy that "rel[ied] solely on the claim that the state had failed to disclose that Rosemond was the confidential informant."  *Id.*  "Accordingly, at the hearing, Cannatelli offered to withdraw the habeas petition if, based on a disclosure by the state, the informant was not Rosemond."  *Id.*  "At no time before or during the hearing did [Francis] inform Cannatelli that he disagreed with this strategy."  *Id.* at *2.  That day, the state habeas court granted Francis's motion and "ordered that the state submit an affidavit to the court identifying . . . the confidential informant."  *Id.* (cleaned up).  If the *ex parte* affidavit revealed that Rosemond was the confidential informant, the state habeas court would "give the information to [Francis's] attorney."  *Id.*  On December 16, the State filed a motion for reconsideration.  *See id.*  And on January 22, 2003, the state habeas court "granted the state's motion for reconsideration and agreed to rehear the matter."  *Id.*  Attorney

Cannatelli "did not visit [Francis] between the time of the motion and the hearing or inform [Francis] of the motion." *Id.*

That rehearing took place on February 5, 2003. *See* Hr'g Tr., App'x M to Comm'rs First Mot. to Dismiss ("Feb. 2003 Hr'g Tr."), Doc. No. 18-15. I will refer to that hearing as the "February 2003 Hearing." There, Attorney Cannatelli represented Francis. But Francis was not present; Attorney Cannatelli waived Francis's appearance. *See id.* at 3. The state habeas court indicated that it did not view Francis's presence as "necessary, because this is not dispositive of the case." *Id.* Later during the February 2003 Hearing, Attorney Cannatelli repeatedly represented that, if the confidential informant were not Rosemond, Francis would withdraw his habeas action. *See id.* at 22–23, 25–27. The State then provided a Hartford Police Officer's "affidavit saying that Cory Ros[e]mond was not the confidential informant." *Id.* at 26; *see also Francis*, 2008 WL 1914442, at *2. Attorney Cannatelli read the affidavit and then said: "[I]t seems to be sufficient, your Honor." Feb. 2003 Hr'g Tr., Doc. No. 18-15, at 26. Attorney Cannatelli asked for a copy of the affidavit to give to Francis and concluded: "I will withdraw the action." *Id.* at 26–27. The state habeas judge later asked Attorney Cannatelli: "Well, you want to file the withdrawal before you talk to your client?" *Id.* at 29. Attorney Cannatelli responded: "Yes, your Honor." *Id.* And that was that.

As another state habeas court later recounted, "Cannatelli visited [Francis] soon after filing the withdrawal." *Francis*, 2008 WL 1914442, at *2. "They were both upset with what had happened." *Id.* "Nothing further took place, however, until August or September 2003 . . . when Cannatelli filed a 'Motion to Set Aside Withdrawal of the Action.'" *Id.* at *3. The state habeas court held a hearing on that motion on December 18, 2003. *See id.* I will refer to that hearing as the "December 2003 Hearing." Critically, Francis was present at the December 2003 Hearing.

*See id.* at *4 (recounting portions of the transcript during which the court spoke directly to Francis).

At the December 2003 Hearing, the parties and the state habeas court disagreed regarding whether Francis had been present at the February 2003 Hearing.  *See id.*  The state habeas court erroneously thought that Francis had been there.  Francis (and Attorney Cannatelli) correctly recalled that Francis had been absent.  Incredulous, the state habeas court denied Francis's motion to set aside the judgment "without prejudice only on the basis that you may want to get a transcript" of the February 2003 Hearing that proved Francis's absence.  *Id.* at *4.  The state habeas court continued:

> If you decide that you want to do something on it, you know you can file the transcript and ask for reconsideration of the motion because I'm denying it without prejudice, but I think you have to do that certainly within four months.
>
> . . .
>
> But assuming the transcript doesn't show anything, which is my belief, then there's nothing pending before the court.  This case has been withdrawn, Mr. Francis, then you can file a habeas.
>
> . . .
>
> If you want to do something to reopen it go right ahead.  If not, Mr. Francis, the only thing we have left for you is to bring a habeas claiming that Mr. Cannatelli was ineffective and in foreclosing the other possibilities of discovery.

*Id.*  Attorney Cannatelli took no further action in the case, although, apparently, a transcript of the February 2003 Hearing was "delivered to Attorney Cannatelli in April [] 2004."  Francis's Second Habeas Br., Doc. No. 65-3, at 6.

No facts in the record shed any light on Francis's actions between December 18, 2003 and May 17, 2005,[8] when he filed a *pro se* habeas petition, his second. *See* Second Pet. for Writ of Habeas Corpus, App'x N to Comm'rs First Mot. to Dismiss, Doc. No. 18-16. In that second petition, Francis claimed, in relevant part, that his habeas counsel—Attorney Cannatelli—had been ineffective in withdrawing Francis's first habeas petition. *See id.* at 7–8; *see also Francis*, 182 Conn. App. at 650. Subsequently, Francis was appointed counsel, and counsel filed an amended petition on March 19, 2007. *See* Second Am. Pet., App'x O to Comm'rs First Mot. to Dismiss, Doc. No. 18-17. On April 15, 2008, after a trial, the state habeas court granted Francis's second habeas petition and ordered that Francis's first habeas petition, alleging ineffective assistance of trial counsel, be restored to the docket. *See Francis*, 2008 WL 1914442, at *7.

In September 2010, Francis's new habeas counsel—Attorney Michael Day—filed an amended petition in the restored first habeas action. *See* Am. Restored Pet., App'x Q to Comm'rs First Mot. to Dismiss, Doc. No. 18-19, at 8–16. On July 2, 2012, after holding a trial, the state habeas court denied Francis's restored habeas petition, which asserted, in relevant part, that Francis's trial counsel, Attorney William Collins, had been constitutionally ineffective. *See* Mem. of Decision, App'x Q to Comm'rs First Mot. to Dismiss, Doc. No. 18-19, at 26–44. Once

---

[8]     The parties apparently agree that Francis's second habeas petition was filed on May 17, 2005. *See* Francis's Opp'n, Doc. No. 65, at 10 ("[O]n May 17, 2005, Francis filed a second habeas petition in state court."); Mem. in Supp. Comm'rs Renewed Mot. to Dismiss, Doc. No. 62-3, at 5 ("[O]n May 17, 2005, the petitioner filed a second habeas petition in state court."). In my view, it is not entirely clear when Francis filed his *pro se* second habeas petition. To be sure, the petition includes a Superior Court stamp from May 17. *See* Second Pet. for Writ of Habeas Corpus, App'x N to Comm'rs First Mot. to Dismiss, Doc. No. 18-16, at 2. However, the petition also bears a Superior Court stamp from April 18, 2005. *See id.* So far as I am aware, none of the decisions in the lengthy history of Francis's case have shed light on that discrepancy. Here, I will assume that Francis filed his second habeas petition on May 17, 2005. I do so for two reasons. First, the parties apparently agree on that date. Second, doing so does not practically prejudice Francis. As explained below, I hold that Francis filed this habeas petition 466 days too late. The difference between April 18, 2005 and May 17, 2005 is 29 days. Thus, even if I treated Francis's second habeas petition as having been filed on April 18, 2005, his instant federal habeas petition would be 437 days too late.

again, Francis appealed, and, on June 10, 2014, the Connecticut Appellate Court affirmed the

state habeas court's judgment. *See Francis v. Comm'r of Corr.*, 150 Conn. App. 906 (2014).

While the appeal from his restored first habeas action was pending, Francis filed a third

state habeas action, claiming that Attorney Day had been constitutionally ineffective in litigating

Francis's restored first habeas action. *See Francis v. Warden, State Prison*, 2016 WL 4150434,

at *1 (Conn. Super. Ct. June 30, 2016). In June 2016, the state habeas court denied Francis's

third state habeas petition. *See id.* at *4. Francis appealed. *See* Appellate Docs., Appendices U

and V to Comm'rs First Mot. to Dismiss, Doc. Nos. 18-23 and 18-24. On June 12, 2018, the

Connecticut Appellate Court affirmed the state habeas court's judgment denying Francis's third

habeas petition. *See Francis*, 182 Conn. App. at 656. Francis filed a petition for certification to

the Connecticut Supreme Court; on September 12, 2018, the Connecticut Supreme Court denied

that petition for certification. *See Francis v. Comm'r of Corr.*, 330 Conn. 903 (2018).

On May 21, 2018, while his petition for certification was pending in the Connecticut

Supreme Court, Francis, acting *pro se*, filed this federal habeas action. *See* Habeas Pet., Doc.

No. 1. Francis raises two grounds for relief. First, Francis claims that he "was denied his right

to due process to confrontation and to present a defense by the trial court[']s refusal to introduce

evidence that two state witnesses were gang members for the purpose of showing that they

falsely had accused him of murder." *Id.* at 9. Second, Francis claims that "trial counsel was

ineffective when he failed to investigate who the confidential informer was, as it was obvious

that the informer was a witness to the crime." *Id.* at 11. Francis continued: "Counsel was also

ineffective in failing to put forth the defense of third party culpability." *Id.*

On May 25, I ordered the Commissioner to show cause why I should not grant the relief

that Francis sought. *See* Order to Show Cause, Doc. No. 5. On July 23, the Commissioner filed

a motion to dismiss.  *See* Comm'rs First Mot. to Dismiss, Doc. No. 18.  The Commissioner

argued that Francis's federal habeas petition was time-barred, and, even if not, contained some

unexhausted claims.  *See id.* at 1.  On October 17, Francis filed a *pro se* opposition.  *See*

Francis's Opp'n, Doc. No. 33.  Francis claimed that his petition was not time-barred because the

Firearm Alteration Count was not formally dismissed until "September 25, 2018, when his new

mittimus was issued."  *Id.* at 3.  In the alternative, Francis argued that I should toll AEDPA's

statute of limitations based on various considerations.  *See id.* at 3–7.

In March 2019, I issued a ruling granting the Commissioner's motion to dismiss Francis's

federal habeas petition.  *See* Ruling, Doc. No. 34; *Francis v. Comm'r of Corr.*, 2019 WL

8223557, at *1 (D. Conn. Mar. 15, 2019).  I reasoned that Francis's petition was time-barred.

*See* Ruling, Doc. No. 34, at 5.  In so ruling, I rejected Francis's argument that "the limitations

period began running on September 25, 2018, when he allegedly received a new mittimus from

the state court dismissing the alteration of firearms charge."  *Id.* at 5–6.  I noted that I had not

seen that mittimus because Francis had not attached it to his motion.  *See id.* at 6 n.2.  Surveying

the relevant case law, I held that Francis's judgment of conviction became final in the fall of

1998, no matter what happened on remand with respect to the Firearm Alteration Count because

the remand of that count was for a purely "ministerial purpose."  *See id.* at 6–10.  Thus,

AEDPA's one-year clock began ticking in the fall of 1998, and Francis's petition was time-

barred.  I declined to equitably toll AEDPA's statute of limitations, and I also noted that "Francis

has not presented any new and reliable evidence showing his actual innocence."  *Id.* at 10.

Finally, because I dismissed Francis's petition as time-barred, I did "not address the alternative

argument that Francis ha[d] failed to exhaust his state court remedies with respect to all claims

raised therein."  *Id.* at 10 n.3.  Because "reasonable jurists could debate whether the petition

should have been resolved in a different manner," I directed the Clerk to issue a certificate of appealability on that issue. *Id.* at 11.

In September 2020, the Second Circuit vacated the judgment I had entered in favor of the Commissioner and remanded for further factfinding. *See* Mandate, Doc. No. 51; *Francis v. Comm'r of Corr.*, 827 F. App'x 129, 132 (2d Cir. 2020). More particularly, the Second Circuit noted that "instead of determining when the alteration count was formally dismissed, the district court reasoned that the Connecticut Supreme Court's remand to the Superior Court was for a purely ministerial purpose, as the Superior Court was not required to take any action unless the state ultimately chose to retry Francis (which it did not)." Mandate, Doc. No. 51, at 6. Although my evaluation "raise[d] an interesting legal question," the Second Circuit wrote, "it appears possible (maybe even likely) that this case can be resolved on simpler grounds." *Id.* On appeal, the Commissioner had represented that the Firearm Alteration Count "was formally dismissed and Francis was resentenced sometime in late 1998." *Id.* "If that is true, and if Francis was made aware of the dismissal at that time," the Second Circuit reasoned, "that would conclusively resolve this case." *Id.* at 6–7. For several reasons—including the facts that "the Commissioner did not make this argument below" and that the Commissioner relied on a September 1998 transcript that was not in the record—the Second Circuit concluded that "the best approach is to send the case back to the district court for further factual development on when the alteration count was formally dismissed (and when Francis learned of that dismissal)." *Id.* at 7–8.

Following the remand, I appointed counsel for Francis. *See* Orders, Doc. Nos. 47 and 48. In May 2021, the Commissioner renewed its motion to dismiss based on untimeliness. *See* Comm'r's Renewed Mot. to Dismiss, Doc. No. 62. In June, Francis, through counsel, filed an opposition. *See* Francis's Opp'n, Doc. No. 65. And in July, the Commissioner filed a reply. *See*

16

Comm'rs Reply, Doc. No. 69.  On August 19, I held a hearing on the Commissioner's renewed

motion to dismiss and took the motion under advisement.  *See* Min. Entry, Doc. No. 72.

## III.    Discussion

The only issue in dispute is whether Francis's federal habeas petition is timely.  More

specifically, the parties dispute whether AEDPA's statute of limitations was tolled during two

distinct periods.  The first period regards the 404 days between December 2, 1998 (when the

AEDPA clock began running, as explained below) and January 10, 2000 (when Attorney

Cannatelli filed a petition for a new trial).  I will refer to that period as the "First Period."  The

second period spans the 832 days between February 5, 2003 (when Attorney Canntalli withdrew

Francis's first habeas petition) and May 17, 2005 (the date on which Francis filed his *pro se*

second habeas petition).  I will refer to that period as the "Second Period."  In my view, Francis

is not entitled to equitable tolling for the vast majority of both periods, and so his petition is

untimely.

A.    The Law

"AEDPA's one-year limitations period may be tolled only if, consistent with the general

requirements of equity, a petitioner demonstrates (1) that he has been pursuing his rights

diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely

filing."  *Harper v. Ercole*, 648 F.3d 132, 136 (2d Cir. 2011) (quoting *Holland*, 560 U.S. at 649)

(cleaned up).  "While equitable tolling is warranted only in rare and exceptional circumstances,

courts do not apply its requirements mechanistically."  *Id.* (cleaned up).  "Rather, the exercise of

a court's equity powers must be made on a case-by-case basis, mindful that specific

circumstances, often hard to predict in advance, could warrant special treatment in an appropriate

17

case." *Id.* (quoting *Holland*, 560 U.S. at 649–50). "[I]t is the petitioner's burden to prove that he is entitled to such relief." *Favourite v. Colvin*, 758 F. App'x 68, 69 (2d Cir. 2018).

"The term 'extraordinary' refers not to the uniqueness of a party's circumstances, but rather to the severity of the obstacle impeding compliance with a limitations period." *Harper*, 648 F.3d at 137. "Attorney error generally does not rise to the level of an 'extraordinary circumstance.'" *Martinez v. Superintendent of E. Corr. Facility*, 806 F.3d 27, 31 (2d Cir. 2015) (citing *Baldayaque v. United States*, 338 F.3d 145, 152 (2d Cir. 2003)). "However, attorney negligence may constitute an extraordinary circumstance when it is 'so egregious as to amount to an effective abandonment of the attorney-client relationship.'" *Id.* (quoting *Rivas v. Fischer*, 687 F.3d 514, 538 (2d Cir. 2012)).

"To secure equitable tolling, it is not enough for a party to show that he experienced extraordinary circumstances. He must further demonstrate that those circumstances caused him to miss the original filing deadline." *Harper*, 648 F.3d at 137. "A court may conclude that such causation is lacking where the identified extraordinary circumstances arose and concluded early within the limitations period. In such circumstances, a diligent petitioner would likely have no need for equity to intervene to file within the time remaining to him." *Id.* "[A] court also may find causation lacking where a petitioner has been 'so neglectful in the preparation of his petition that even in the absence of the extraordinary circumstances, a reasonable person in the petitioner's situation would have been unable to file in the time remaining within the limitations period." *Id.* at 138 (quoting *Valverde v. Stinson*, 224 F.3d 129, 136 (2d Cir. 2000)) (cleaned up). "This comports with the principle that equity will not intervene to reward negligence." *Id.*

Regarding diligence, "[c]onsistent with the maxim that equity aids the vigilant, a petitioner seeking equitable tolling of AEDPA's limitations period must demonstrate that he

acted with reasonable diligence throughout the period he seeks to toll." *Id.* (cleaned up). "This standard calls for reasonable diligence, not maximum feasible diligence." *Id.* (cleaned up). "If such a showing is not made, equitable tolling should be denied or at least circumscribed to the period for which diligence and causation are established." *Id.* at 139.

B.      The Parties' Arguments

In its renewed motion to dismiss, the Commissioner again argues that Francis's petition is time-barred. In support, the Commissioner submits two new appendices for my consideration. The first, as described above, is a transcript of the September 1998 Hearing. *See* Sept. 1998 Hr'g Tr., Doc. No. 62-1. The second is a "copy of the trial court's file" that "contains a copy of the revised mittimus, which is dated September 25, 1998." Comm'rs Renewed Mot. to Dismiss, Doc. No. 62, at 3; *see also* Court Records, Doc. No. 62-2. In the Commissioner's view, those two appendices definitively establish that the Firearm Alteration Count was dismissed on September 4, 1998.

The Commissioner claims that AEDPA's clock began to run on December 2, 1998, when the SRD's decision affirming Francis's sentence was filed. *See* Mem. in Supp. Comm'rs Renewed Mot. to Dismiss ("Comm'rs Mem. of Law"), Doc. No. 62-3, at 9. According to the Commissioner, the AEDPA clock then ran for the entirety of the First Period (until January 10, 2000). *See id.* at 9–10. Further, the Commissioner claims that the AEDPA clock began running again on "February 5, 2003, when the first habeas matter was withdrawn." *Id.* at 10. The Commissioner maintains that the ADEPA clock kept ticking for the entirety of the Second Period (until May 17, 2005). *See id.* Because those two periods amount to over 1,200 days, according to the Commissioner, Francis's petition is clearly time-barred. *See id.*

Of course, Francis sees things differently. Francis now acknowledges that the Firearm Alteration Count was dismissed on September 4, 1998. *See* Francis's Opp'n, Doc. No. 65, at 3. However, Francis argues that I should equitably toll the 39-day period between December 2, 1999 and January 10, 2000. *See id.* at 6–10. Francis claims that "extraordinary circumstances" prevented his filing a post-conviction motion during that time frame, even though he was reasonably diligent under the circumstances. All of Francis's arguments arise from the declaration he submitted in opposition to the Commissioner's renewed motion to dismiss.

First, Francis claims that he was essentially abandoned by his trial counsel, Attorney William Collins. To that end, Francis claims that, after the Connecticut Supreme Court's ruling in his case in August 1998, Attorney William Collins "did not contact me at any time" and "abandoned his representation of me without notice to me." Francis's Decl., Doc. No. 65-1, at ¶¶ 3, 5. In support of that contention, Francis points out that William Collins did not attend the September 1998 Hearing; rather, William Collins' son, Attorney Matthew Collins, "purported to represent me at this hearing." *Id.* at ¶ 6. Francis claims that he did not authorize Matthew Collins—whom Francis had never met—to appear on his behalf at the September 1998 Hearing. *See id.* at ¶ 7. Francis swears that "Attorney Matthew Collins did not advise me of any of my legal rights." *Id.* After the September 1998 Hearing, too, Francis complains that neither William nor Matthew Collins "ever contacted me again to explain the legal implications of what had occurred or to advise me as to my rights with respect to future actions." *Id.* at ¶ 8.

As described above, though, Francis soon retained Attorney Cannatelli. In his declaration, Francis claims that "[a]t some point during 1999," when he was in DOC custody, he was "informed by another inmate that I needed to file an action challenging my conviction before the time to do so ran out." *Id.* at ¶ 9. Francis then "contacted Attorney Frank Cannatelli

in 1999" and "instructed Attorney Cannatelli to file an action as soon as possible and to not let

the time run out." *Id.* at ¶ 10. (As described above, based on other submissions that Francis has

made, I conclude that Francis contacted Attorney Cannatelli on February 28, 1999. *See supra*

n.7 and accompanying text.) Francis swears that Attorney Cannatelli never told Francis about

the applicable statute of limitations; instead, Attorney Cannatelli "told me not to worry about it,

and that he would file an action in time to 'stop the clock.'" *Id.* at ¶¶ 10, 12. At some point,

Attorney Cannatelli accepted money that Francis's mother "had offered to pay on my behalf."

*Id.* at ¶ 11. "During this period of time," Francis avers, "I relied exclusively on Attorney

Cannatelli to give me correct legal advice and to protect my rights." *Id.* at ¶ 14.

Admirably, Francis concedes that "each of the[se] circumstances, standing alone, may not

[]rise to the level of an extraordinary circumstance." Francis's Opp'n, Doc. No. 65, at 8. Still,

Francis claims that "the totality of the circumstances, together in light of the relatively short

period of time that Francis seeks the limitations period to be equitably tolled, warrants the

exercise of this Court's discretion." *Id.* at 9. More specifically, Francis claims that "[d]espite

[his] diligence, he was simply unable to learn of, and act upon, his rights within" AEDPA's

statutory limitation period. *Id.* Francis claims that he "relied on" Attorney Cannatelli to keep his

word and file an action in a timely manner, but "through no fault of Francis, the attorney did not

file a state court action until January 10, [2000], nearly 11 months after Francis had initially

contacted" him. *Id.*

Regarding the Second Period, Francis argues that AEDPA's clock did not run, or, even if

it did, that it should be equitably tolled. More specifically, Francis argues that AEDPA's clock

did not run from January 1, 2001 (when Francis filed his first *pro se* habeas petition) until June

10, 2014 (when "the Connecticut Appellate Court affirmed the judgment of the habeas court"

that had denied Francis's restored first habeas petition). *Id.* at 11. Francis thus asserts that his first habeas petition was "pending" within the meaning of section 2244(d)(2) for over 13 years because it was withdrawn only because of Attorney Cannatelli's constitutionally ineffective assistance. *See id.* at 11–12. And even if I disagreed with Francis that his state proceedings were "pending" throughout those 13 years, "the conduct of [Attorney Cannatelli] in, *inter alia*, improperly withdrawing Francis's habeas petition is exactly the type of attorney misconduct that has been held to support a finding of equitable tolling." *Id.* at 12.

In its reply brief, the Commissioner takes issue with Francis's contentions. Regarding the First Period, the Commissioner claims that neither was the conduct that Francis highlights an "extraordinary circumstance," nor did Francis's own conduct display reasonable diligence. Instead, during the First Period, Francis "sat back and waited for others to act on his behalf." Comm'rs Reply, Doc. No. 69, at 2. "It was not until sometime in 1999 that he took any affirmative steps to initiate a post-conviction proceeding." *Id.* The Commissioner points out that Francis could have filed a motion for post-conviction review any time after his sentencing in December 1996. *See id.*[9] And, even though he was represented by multiple counsel (nearly) continuously between December 1996 and January 2000—trial counsel William Collins, appellate counsel Mark Rademacher, and post-conviction counsel Frank Cannatelli—Francis's "affidavit is silent regarding any pre-1999 attempts to obtain information about available forms of post-conviction relief in state and/or federal court." *See id.* at 2–3.

The Commissioner takes further aim at Francis's claims regarding the First Period. For instance, the Commissioner argues that Francis's complaint that Attorney William Collins abandoned him is "highly suspicious." *Id.* at 3. The Commissioner points out that Francis

---

[9]      Indeed, in Connecticut, a petitioner may bring a habeas claim while a direct appeal of the petitioner's conviction is still pending. *See Sinchak v. Comm'r of Corr.*, 126 Conn. App. 684, 686 n.2 (2011) (explaining the holding of *State v. Leecan*, 198 Conn. 517, 541–42 (1986)).

"never objected to" Attorney Matthew Collins' representing him at the September 1998 Hearing. *See id.* In addition, the Commissioner notes that on October 27, 1998—which, of course, was *after* the September 1998 Hearing—Attorney William Collins represented Francis at a hearing before the SRD. *See id.*; SRD Letter, App'x AA to Comm'rs Reply, Doc. No. 69-1, at 2 (explaining that Francis's appeal to the SRD "was argued on 10/27/1998 and counsel for the petitioner was Attorney William B. Collins").[10] With respect to Francis's complaints regarding Attorney Cannatelli, the Commissioner argues that, even though Francis asked Attorney Cannatelli to file a post-conviction motion within the applicable time limit, Attorney Cannatelli "could not do so instantaneously" because he "had an ethical obligation to obtain and review materials related to the petitioner's criminal proceedings and formulate non-frivolous claims before filing any such action." Comm'rs Reply, Doc. No. 69, at 3 (citing Conn. R. of Prof. Conduct 3.1). Relatedly, Francis could have—but did not—seek "habeas corpus relief in state court and/or federal court by filing a petition *pro se*." *Id.* at 4.

Regarding the Second Period, the Commissioner argues that Francis's first habeas petition was not "pending" from 2001 to 2014; rather it was withdrawn in 2003 and restored to the docket in 2008. In support of that argument, the Commissioner points to an analogous line of cases regarding whether retroactive tolling is available after a state habeas appellate court grants a petitioner's motion to file an out-of-time appeal. That line of cases—discussed further below—holds that retroactive tolling is *not* available in that situation because no state post-conviction proceeding was "pending" in the interim. *See id.* at 4–9 (citing cases). Although Francis's case "does not involve an untimely request for further review by a higher court, the principles are the same," in the Commissioner's view. *Id.* at 8. Once a case is withdrawn,

---

[10]    Notably, though, the July 16, 2021 letter from the SRD's case flow coordinator also says: "Please disregard my previous letter from July 15, 2021 as the attorney information was incorrect." SRD Letter, App'x AA to Comm'rs Reply, Doc. No. 69-1, at 2. The Commissioner did not attach the July 15 letter to its reply brief.

"because a prisoner is not attempting to exhaust his state remedies during this period, his post-conviction matter cannot be deemed 'pending.'" *Id.* at 8–9.

C.   Evaluation

1.   Dismissal of the Firearm Alteration Count

In the Second Circuit's mandate, it identified one key issue:  Whether the Firearm Alteration Count "was formally dismissed and Francis was resentenced sometime in late 1998." Mandate, Doc. No. 51, at 6.  If so, and if Francis was aware of the dismissal at the time, the Second Circuit concluded that "that would conclusively resolve this case." *Id.* at 6–7.

The additional evidence submitted on remand conclusively establishes that the Firearm Alteration Count was dismissed at the September 1998 Hearing, at which Francis was present. As described above, at the September 1998 Hearing, the prosecutor "enter[ed] a nolle" on the Firearm Alteration Count.  Sept. 1998 Hr'g Tr., Doc. No. 62-1, at 2.  Francis's lawyer sought to clarify—and the judge confirmed—that the Firearm Alteration Count "may be dismissed." *Id.* The judge then said:  "What remains in effect is the murder conviction and the pistol without a permit . . . and the sentence of sixty years, I believe." *Id.* at 3.  Even if that transcript were not enough, later records in the case's file confirm that the Firearm Alteration Count was dismissed on September 4.  *See, e.g.*, Court Records, Doc. No. 62-2, at 1.  A "revised mittimus as to count three" issued on September 25, 1998; that mittimus indicated that Francis had no sentence to serve on Count Three because it had been "dismissed on 9/4/1998," and so Francis's total effective sentence remained 60 years.  *Id.* at 14.  As he must, Francis now acknowledges that the Firearm Alteration Count was dismissed in September 1998;[11] his argument now is based on equitable tolling of later periods.  Below, I address those arguments.

---

[11]     *See* Francis's Opp'n, Doc. No. 65, at 3 (agreeing that at the September 4 Hearing "Matthew Collins requested, and both the State and the trial court agreed, that the alteration count may be dismissed").  To be sure, in

2.     When did AEDPA's Clock Begin to Run?

The parties apparently agree that AEDPA's clock began ticking on December 2, 1998, which was when the SRD affirmed Francis's sentence.  But the parties do not explain their conclusion.  And, in fact, AEDPA's clock might have conceivably begun ticking on another date—namely, November 16, 1998.

The Connecticut Supreme Court issued its decision regarding Francis's direct appeal on August 18, 1998.  In the normal course, the AEDPA clock begins running "only after the denial of certiorari or the expiration of time for seeking certiorari." *Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir. 2001).  Francis did not file a petition for a writ of certiorari to the United States Supreme Court.  And Francis had 90 days to file such a petition.  *See* Supreme Court Rule 13.1. 90 days after August 18, 1998 was November 16, 1998.

In my view, although there is no case precisely on point, AEDPA's clock did not run during the pendency of Francis's application to the SRD because such an application is a "properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim."  28 U.S.C. § 2244(d)(2).  The SRD consists of three Superior Court judges, appointed by the Chief Justice of the State of Connecticut.  *See* Conn. Gen. Stat. § 51-194.  A defendant sentenced to a term of imprisonment greater than three years may (subject to several exceptions not applicable here), within 30 days after the sentence was imposed, file "an application for review of the sentence by the review division."  *Id.* § 51-195.  "The filing of an application for review shall not stay the execution of the sentence."  *Id.*  The SRD "may order such different sentence or sentences to be imposed as could have been imposed at the time of the

the past, Francis has claimed not to know when Count Three was dismissed, or that it was dismissed much later than September 1998. *See, e.g.,* Am. Pet., App'x L to Comm'rs First Mot. to Dismiss, Doc. No. 18-14, at 12 (from 2002); Francis's First Opp'n, Doc. No. 33, at 3 (claiming 2018).  Notably, Francis makes no mention of any September 25, 2018 mittimus, which formed the basis for his opposition to the Commissioner's first motion to dismiss.  *See* Mandate, Doc. No. 51, at 4 & n.3.

imposition of the sentence under review, or may decide that the sentence or commitment under review should stand." *Id.* § 51-196(a).  "If the review division orders a different sentence or disposition of the case, the Superior Court shall resentence the defendant or make any other disposition of the case ordered by the review division." *Id.* § 51-196(d).  "The decision of the review division in each case shall be final . . . ." *Id.*  When the SRD decides to affirm the trial court's sentence, a defendant may not appeal the SRD's determination.  *See State v. Rupar*, 293 Conn. 489, 499 (2009); *State v. Nardini*, 187 Conn. 109, 117 (1982).  The SRD "offers defendants an optional, de novo hearing as to the punishment to be imposed."  *State v. Taylor*, 91 Conn. App. 788, 794 (2005).  "The purpose of the legislation was to create a forum in which to equalize the penalties imposed on similar offenders for similar offenses."  *Id.*

So far as I am aware, it is an open question in this Circuit whether a pending application for review to the SRD constitutes a "State post-conviction or other collateral review with respect to the pertinent judgment or claim" that might toll AEDPA's statute of limitations.  28 U.S.C. § 2244(d)(2).  The parties do not shed any light on the question.  I am aware of one Connecticut district court that has held that "the filing of an application for sentence review did not toll the [AEDPA] limitations period."  *Billie v. Warden*, 2010 WL 3021517, at *4 (D. Conn. July 29, 2010).  And I am aware of at least one other Connecticut district court that has side-stepped the question.  *See Staton v. Brighthaupt*, 2012 WL 1144035, at *3 (D. Conn. Apr. 4, 2012) (declining to decide the matter because, even if the court accepted the later date, the habeas petition was still time-barred).

In my view, the pendency of an application before the SRD does toll AEDPA's statute of limitations.  Although there is no perfectly on-point precedent in this Circuit, some Supreme Court, Second Circuit, and sister Circuit precedent strongly supports my view.

As described above, AEDPA's one-year statute of limitations is tolled in "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending."  28 U.S.C. § 2244(d)(2).  There is no question that Francis's application to the SRD was "properly filed."  And there is also no question that Francis's application to the SRD regarded "the pertinent judgment" because the application sought alteration of his sentence, and "[i]n a criminal case . . . the sentence *is* the judgment."  Mandate, Doc. No. 51, at 4 (cleaned up).  The only question is whether Francis's application to the SRD sought "collateral review."

Francis's application to the SRD sought collateral, rather than direct, review.  "Collateral review" means "judicial reexamination of a judgment or claim in a proceeding outside of the direct review process."  *Wall v. Kholi*, 562 U.S. 545, 553 (2011).  In *Wall*, the Supreme Court held that a Rhode Island law allowing a defendant to file a motion for a reduced sentence involved "collateral review."  More specifically, the relevant Rhode Island law allowed a defendant to make a motion to the "same trial justice who sentenced" him.  *Id.* at 554.  That trial justice could reduce a sentence if "on reflection or on the basis of changed circumstances [] the sentence originally imposed was, for any reason, unduly severe."  *Id.*  Under the Rhode Island law, "appellate review of the trial justice's decision is limited."  *Id.*  The *Wall* Court held that the Rhode Island sentence reduction proceeding was "collateral" because it was "not part of the direct review process."  *Id.* at 555.

In *Wall*'s wake, numerous courts of appeals have examined similar state statutory provisions and have held that those provisions allow for "collateral" proceedings.  *See, e.g.*, *Mitchell v. Green*, 922 F.3d 187, 195 (4th Cir. 2019) (Maryland law); *Rogers v. Secretary, Dep't of Corr.*, 855 F.3d 1274, 1277 (11th Cir. 2017) (Florida law); *Najera v. Murphy*, 462 F. App'x

827, 830 (10th Cir. 2012) (Wyoming law).  Particularly instructive is a recent Ninth Circuit case:

*Branham v. Montana*, 996 F.3d 959 (9th Cir. 2021).  In *Branham*, the Ninth Circuit considered

whether a defendant's application to Montana's sentence review division (which is remarkably

similar to Connecticut's)[12] was "a form of collateral review."  *Id.* at 966.  The Ninth Circuit held

that it was.  *See id.*  In exactly the same way that a proceeding before Montana's sentence review

division in *Branham* is a "collateral" proceeding, a proceeding before the SRD here is a

"collateral" proceeding.  An application for sentence review to the SRD is "collateral" because it

does not take place as part of direct review:  It "offers defendants an optional, de novo hearing as

to the punishment to be imposed."  *Taylor*, 91 Conn. App. at 794.

Connecticut's carefully circumscribed system regarding convicted defendants' appeals of

their sentences further supports my view that a proceeding before the SRD is a "collateral" one.

In my understanding, a criminal defendant in Connecticut state court cannot challenge the

reasonableness of his sentence on direct appeal.  *See, e.g.*, *Rupar*, 293 Conn. at 497–98 ("[I]t is

well established that this court lacks jurisdiction to review the sentencing court's . . . exercise of

discretion in determining an appropriate sentence."); *State v. Lopez*, 5 Conn. App. 599, 611

(1985) ("An appellate court will not review the proper exercise of a trial court's discretion to fix

a sentence which is within the statutory limits of the crime for which the defendant is being

sentenced.").  In contrast, a criminal defendant in Connecticut state court may challenge the

*legality* of his sentence on direct appeal.  *See, e.g.*, Conn. Practice Book § 43-22; *State v.*

---

[12]        *See* Mont. Code Ann. § 46-18-901(a) (establishing a three-judge panel "to act as a review division"); *id.* § 46-18-903(1) (allowing defendants sentenced to one year or more of imprisonment to file an application for review within 60 days of imposition of sentence); *id.* § 46-18-904(1) (allowing review division either to "order a different sentence or sentences to be imposed as could have been imposed at the time of the imposition of the sentence under review, including a decrease or increase in the penalty," or to "decide that the sentence under review should stand"); *id.* § 46-18-905(1) ("The decision of the review division in each case is final . . . .").  Whereas the Montana Supreme Court "reviews sentences for legality—that is, whether the sentence is within the parameters of the sentencing statute," the "Sentence Review Division is charged with reviewing the inequity or disparity of a sentence." *Branham*, 996 F.3d at 965 (cleaned up).

*Francis*, 322 Conn. 247, 259 (2016) ("[I]t is axiomatic that the judicial authority may at any time correct an illegal sentence or other illegal disposition, or it may correct a sentence imposed in an illegal manner.") (cleaned up).  Therefore, Connecticut deliberately bifurcates which aspects of his sentence a convicted defendant may challenge on direct appeal and before the SRD.  It would fly in the face of Connecticut's scheme to conclude that the SRD, too, conducts a form of direct review.  *Cf. Branham*, 996 F.3d at 967–68 (making similar point regarding Montana's system).

Supreme Court and Second Circuit case law—as well as plain meaning—also confirms that a proceeding before the SRD involves "review."  In *Wall*, the Supreme Court defined "review" as "an act of inspecting or examining or a judicial reexamination," which, for instance, "commonly denotes a looking over or examination with a view to amendment or improvement."  *Wall*, 562 U.S. at 553.  Assessing the Rhode Island law at issue, the *Wall* Court continued:  "The decision to reduce a sentence, while largely within the discretion of the trial justice, involves judicial reexamination of the sentence to determine whether a more lenient sentence is proper."  *Id.* at 555–56.  Just like the Rhode Island law at issue in *Wall*, Connecticut law allows the SRD to reconsider and reduce a sentence.  *See* Conn. Gen. Stat. § 51-196(a).

In a different context, the Second Circuit has employed reasoning that strongly suggests the SRD exercises the power of "review."  In *Collins v. Ercole*, the Second Circuit affirmed the district court's dismissal of a petitioner's habeas action as time-barred.  667 F.3d 247, 253 (2d Cir. 2012).  In doing so, the Second Circuit brushed aside the petitioner's argument that the AEDPA clock was tolled during the pendency of a post-conviction motion arguing that New York's Department of Correction had improperly determined that his sentences should run consecutively, rather than concurrently.  *See id.* at 250–51.  In the Second Circuit's view, that post-conviction motion "did not seek review or reconsideration of the pertinent judgment," but

29

"sought, instead, a recalculation of his prison term, supposedly in accordance with that judgment." *Id.* at 250.  Interpreting *Wall*, the Second Circuit continued:  "Read straightforwardly, [*Wall*] says that 'review' occurs when a reviewing court reconsiders the work of the original court to correct any error or infelicity committed by that original court—or rather, submits that original court's work to examination for potential revision." *Id.* at 251.  The SRD certainly "reconsiders the work of the original court . . . for potential revision."  Thus, an application to the SRD provides for "review."

The upshot is that, no matter when Francis's conviction became final,[13] AEDPA's statute of limitations was tolled until December 2, 1998.

        3.      The Second Period:  February 5, 2003 to May 17, 2005.[14]

In my view, Francis had no post-conviction proceeding "pending" during the Second Period.  Further, Francis is not entitled to equitable tolling for, at least, the 516 days between December 18, 2003 and May 17, 2005.  As a result, Francis's federal habeas petition is untimely based on my consideration of the Second Period alone.

Francis had no properly filed state post-conviction proceeding "pending" during the entirety of the Second Period.  On February 5, 2003, Attorney Cannatelli withdrew Francis's first state habeas petition on the record in open court.  *See* Feb. 2003 Hr'g Tr., Doc. No. 18-15; *see also Francis*, 2008 WL 1914442, at *3 ("Cannatelli then signed and filed a withdrawal of the case with prejudice.").  Francis did not file his second state habeas petition until May 17, 2005.

---

[13]    In my view, it is still an open question (not necessary to decide in this case), when Francis's judgment became final:  (1) December 23, 1996 (the date of the trial court's initial sentence, as I previously held), or (2) September 4, 1998 (the date on which Francis was resentenced on the Firearm Alteration Count).  That determination depends on whether the Connecticut Supreme Court's remand of the Firearm Alteration Count was for a purely ministerial purpose.  As I have previously explained, in my view, the remand was for a purely ministerial purpose, and so Francis's judgment of conviction became final on December 23, 1996.  *See* Ruling, Doc. No. 34, at 7–10.  However, that determination is not important in this appeal because, as described above, AEDPA's clock did not begin ticking until December 2, 1998.

[14]    I begin by addressing the Second Period because, in my view, my conclusion of untimeliness is especially clear with respect to the Second Period.

The record does not reflect any other action during the Second Period that could constitute a
"properly filed application for State post-conviction or other collateral review with respect to the
pertinent judgment or claim."  28 U.S.C. § 2244(d)(2).

Plain meaning confirms that Francis's first habeas petition was not "pending" during the
Second Period.  "Pending" means "[r]emaining undecided; awaiting decision."  *Pending*,
BLACK'S LAW DICTIONARY (11th ed. 2019); *see also Pending*, RANDOM HOUSE WEBSTER'S
UNABRIDGED DICTIONARY (2d ed. 1998) ("remaining undecided; awaiting decision or settlement;
unfinished") (third definition); *Carey v. Saffold*, 536 U.S. 214, 219 (2002) ("[A]n application is
pending as long as the ordinary state collateral review process is in continuance—*i.e.*, until the
completion of that process.") (cleaned up).  After Attorney Cannatelli withdrew Francis's habeas
petition with prejudice on February 5, 2003, there was nothing in the case that remained
undecided or awaited decision.  Based on the plain meaning of "pending," it is clear that
Francis's first habeas petition was not "pending" during the Second Period.

Subsequent events also confirm that Francis's first habeas petition was not "pending"
during the Second Period.  As the state habeas court considering Francis's second habeas petition
explained:  "[S]oon after" Attorney Cannatelli withdrew Francis's first habeas action, Attorney
Cannatelli visited Francis to tell him about the withdrawal.  *Francis*, 2008 WL 1914442, at *3.
About six months later (in August or September 2003), Francis (through Attorney Cannatelli)
filed a motion to set aside the withdrawal and to reopen Francis's first habeas case.  *See id.*  Of
course, there would be no need to "reopen" a case that was already pending.  Similarly, had
Francis never filed his second habeas petition (which resulted in the restoration of his first
habeas case), the case file from Francis's first habeas petition might still be closed and collecting

dust:  There was no further action necessary on Francis's first habeas petition, and so it was not "pending" during the Second Period.

The analogous line of cases that the Commissioner cites also suggests that Francis's first habeas petition was not "pending" during the Second Period.  Numerous courts of appeals have considered "what effect the granting of a motion for belated appeal from the denial of a timely state application would have on calculating how long that state application was pending under section 2244(d)(2)."  *Moore v. Crosby*, 321 F.3d 1377, 1380 (11th Cir. 2003).  So far as I am aware, every court of appeals to consider the question has held that "an out-of-time appeal does not revive the time during which no state collateral petition was pending before the state court," and so AEDPA's clock is not retroactively tolled during that period of time.  *Id.*; *see also Allen v. Mitchell*, 276 F.3d 183, 185–86 (4th Cir. 2001); *Melancon v. Kaylo*, 259 F.3d 401, 406 (5th Cir. 2001); *Fernandez v. Sternes*, 227 F.3d 977, 979–80 (7th Cir. 2000); *Gibson v. Klinger*, 232 F.3d 799, 806–07 (10th Cir. 2000).  Those courts reason that a different rule might allow for indefinite tolling.  *See Allen*, 276 F.3d at 186 ("[A] contrary approach would undermine the statute of limitations by allowing state courts to extend indefinitely the time for seeking federal review.").  In addition, those courts have noted that their results comport with the purpose of AEDPA's exhaustion requirement because "a petitioner who is not actually in the legitimate process of appealing is not 'attempting to exhaust state court remedies' and therefore is not entitled to the tolling provision."  *Melancon*, 259 F.3d at 406 (construing and quoting *Gibson*, 232 F.3d at 806–07); *cf. Bennett v. Artuz*, 199 F.3d 116, 119 (2d Cir. 1999) (explaining that "[w]hen Congress enacted AEDPA, one of its policy goals was to provide for the exhaustion of state remedies and require deference to the determinations of state courts") (quoting H.R. Conf. Rep. No. 104-518, at 111 (1996)) (cleaned up).  In my view, those courts' holdings offer some support to my

conclusion: They indicate that AEDPA's statute of limitations should not be retroactively tolled when a properly filed post-conviction state court action is closed and later reopened because the properly filed action was not "pending" in the interim.[15]

Although Francis had no properly filed application for state post-conviction review pending during the Second Period, I must still determine whether the AEDPA clock ran during the entirety of the Second Period or if, instead, equitable considerations warrant tolling certain days. In my view, and construing the record in the light most favorable to Francis, I conclude that Francis is entitled to equitable tolling for the period between February 5, 2003 and December 18, 2003. Thus, the AEDPA clock ran for 516 days in the Second Period.

I assume for purposes of this ruling that Attorney Cannatelli's negligence amounted to an "extraordinary circumstance." Indeed, a state habeas court has already held that Attorney Cannatelli's withdrawing Francis's first habeas petition without (at least) obtaining Francis's renewed consent was constitutionally ineffective. *See Francis*, 2008 WL 1914442, at *5; *cf. United States v. White*, 366 F.3d 291, 300 (4th Cir. 2004) (explaining that extraordinary circumstances may have existed based, in part, on "a defendant relying on mistaken advice from

---

[15]     As Francis's counsel forthrightly conceded at oral argument, there are no on-point cases—either supportive or damaging—that shed direct light on whether Francis's first habeas petition was "pending" during the Second Period. Thus, it is unsurprising that the cases Francis cites in his support are distinguishable. In *Bennett v. Artuz*, the Second Circuit explained that the petitioner's state post-conviction proceeding was still "pending" after the court orally denied petitioner's motion—but did not, as required, serve the petitioner with a written copy of the denial— because, without the written order, the petitioner "could not apply for a certificate for leave to appeal." 199 F.3d 116, 120 (2d Cir. 1999). *Bennett* stands for the proposition that the AEDPA clock is tolled during the "gaps" in time—*i.e.*, the periods between denial in a lower state court and the filing of a timely notice of appeal in a higher court—that arise when a petitioner is exhausting a state's collateral appellate process. *See Carey v. Saffold*, 536 U.S. 214, 219–21 (2002). *Bennett* is therefore irrelevant here, where the "gap" concerns the period between the withdrawal of a state post-conviction proceeding and the later filing of another state post-conviction proceeding.

       The second case that Francis cites in his support is *Jimenez v. Quarterman*, 555 U.S. 113 (2009). In *Jimenez*, the Court construed a different part of section 2244(d) that regards "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). In *Jimenez*, a petitioner had filed a state habeas petition; a state appellate court granted the petition and ordered that the petitioner had the "right to file an out-of-time [direct] appeal." *Jimenez*, 555 U.S. at 116. The *Jimenez* Court held that the petitioner's judgment became "final," and thus the AEDPA clock began to tick, only after review was concluded on the petitioner's reopened case on direct review. *See id.* at 118–19. Because Francis's case concerns a different issue—whether his first habeas action was "pending" within the meaning of section 2244(d)(2)—*Jimenez* is of limited import here.

constitutionally ineffective counsel"); *Martinez*, 806 F.3d at 31 (holding that "attorney negligence may constitute an extraordinary circumstance when it is so egregious as to amount to an effective abandonment of the attorney-client relationship") (cleaned up).

Still, no equitable tolling is warranted for (most of) the Second Period because Francis has shown neither that he acted with reasonable diligence nor that Attorney Cannatelli's ineffectiveness caused Francis to miss the filing deadline. Regarding reasonable diligence, no facts in the record suggest that Francis diligently pursued his rights during the Second Period. Although Francis was not present at the February 2003 Hearing, Francis learned about the withdrawal "soon after" and was "upset with what had happened." *Francis*, 2008 WL 1914442, at *3. In addition, by that time, Francis admits that he was aware of (at least) the concept of untimely post-conviction challenges. *See* Francis's Decl., Doc. No. 65-1, at ¶ 9 (explaining that, in prison in 1999, Francis learned that he "needed to file an action challenging my conviction before the time to do so ran out"). Admittedly, in August or September 2003, Francis (through Attorney Cannatelli) filed a motion to set aside the withdrawal and to reopen the case. *See Francis*, 2008 WL 1914442, at *3.[16] Importantly, Francis was present at the December 2003 Hearing, where the state habeas court denied that motion. *See id*. at *3–4. There, the state habeas court advised Francis that he should either file a motion to reopen the case based on the fact that Francis had not been present at the February 2003 Hearing or "bring[] a habeas claiming that Mr. Cannatelli was ineffective." *Id*. at *4. Nevertheless, Francis apparently did nothing until he filed his second *pro se* habeas petition on May 17, 2005. At the least, then, I will not equitably toll the 516 days between December 18, 2003 and May 17, 2005. Francis has not shown that he displayed reasonable diligence in meeting the statutory filing deadline during that period.

---

[16]     No facts in the record elucidate Francis's personal role in the filing of that motion.

Relatedly, I cannot conclude that Attorney Cannatelli's improper withdrawal of Francis's first habeas petition caused Francis to miss the AEDPA filing deadline. As the Second Circuit has cautioned, "equity will not intervene to reward negligence." *Harper*, 648 F.3d at 138. And so, "where the identified extraordinary circumstances arose and concluded early within the limitations period" and a petitioner still misses the filing deadline, a court "may conclude that" the extraordinary circumstances did not cause the petitioner to miss the filing deadline because "a diligent petitioner would likely have no need for equity to intervene to file within the time remaining to him." *Id.* at 137. Such is the case here. The record conclusively demonstrates that Francis knew about the improper withdrawal in February 2003 and was explicitly instructed by the state habeas court regarding the potential for filing a habeas in December 2003. Given those uncontroverted facts, I conclude that Francis could have filed a second habeas case far earlier than he did.

#### 4.      The First Period:  December 2, 1998 to January 10, 2000

Based on my consideration of the Second Period alone, Francis's petition is untimely. However, considering the First Period only bolsters my conclusion: In my view, the vast majority of the First Period should not be equitably tolled.

Francis requests that I equitably toll from December 2, 1999 (one year after the AEDPA clock began ticking) until January 10, 2000 (the day Attorney Cannatelli filed the petition for a new trial). *See* Francis's Opp'n, Doc. No. 65, at 6. But the record contains no facts regarding Francis's—or Attorney Cannatelli's—actions during, or even substantially before, that period. Francis contacted Attorney Cannatelli in late February 1999, shortly after he learned about the concept of timely post-conviction filings. Francis's declaration does not discuss any further communications that Francis had with Attorney Cannatelli, and it also does not describe any

actions that Francis took after that conversation.  As described below, those facts bear particularly on Francis's lack of reasonable diligence.

In any event, construing the record in the light most favorable to Francis, I will equitably toll the period between December 2, 1998 and February 28, 1999.  Francis makes several claims related to that period of time.  First, Francis claims that his trial lawyer—Attorney William Collins—abandoned him.  Francis notes that William Collins' son represented Francis at the September 1998 Hearing without explanation and that William Collins did not contact Francis after the Connecticut Supreme Court reversed and remanded Francis's conviction on the Firearm Alteration Count.  *See* Francis's Decl., Doc. No. 65-1, at ¶¶ 5–8.  Even if that conduct constituted "abandoning" Francis,[17] it would not provide a reason to equitably toll any of the AEDPA limitations period beyond late February 1999.  Although William Collins should have communicated better with Francis in late 1998 and early 1999, Francis admits that beyond that time frame, he "relied exclusively on Attorney Cannatelli to give me correct legal advice and to protect my rights."  Francis's Decl., Doc. No. 65-1, at ¶ 14.  Thus, after Francis contacted Attorney Cannatelli, there is no reason to equitably toll the AEDPA limitations period based on any alleged abandonment by Attorney William Collins:  Francis was not relying on Attorney William Collins for legal advice.  In sum, construing the record in the light most favorable to Francis, I will equitably toll the 88 days between December 2, 1998 and February 28, 1999.

That leaves unaccounted for the 315 days between March 1, 1999 and January 10, 2000. Francis's only argument regarding those days concerns Attorney Cannatelli's inaction.  More

---

[17]    I need not determine whether that conduct amounted to an abandonment because I assume for purposes of this ruling that it did.  However, I note that the Commissioner submitted evidence that Attorney William Collins appeared at a hearing before the SRD on Francis's behalf in October 1998.  *See* Letter, App'x AA to Comm'rs Reply, Doc. No. 69-1, at 2.  In addition, notice of the SRD's December 2, 1998 decision was sent directly to Francis, and so Francis was aware of the decision that day.  *See* Sentencing Review Decision, App'x G to Comm'rs First Mot. to Dismiss, Doc. No. 18-9, at 2.  The SRD's decision was non-appealable.  *See Rupar*, 293 Conn. at 499.

specifically, Francis swears that, in late February 1999, he "instructed Attorney Cannatelli to file

an action as soon as possible and to not let the time run out," and Attorney Cannatelli "told me

not to worry about it, and that he would file an action in time to 'stop the clock.'"  Francis's

Decl., Doc. No. 65-1, at ¶ 10.  Francis also alleges that Attorney Cannatelli accepted some

money from Francis's mother for his work on the case.  *See id.* at ¶ 11.  Still, Attorney Cannatelli

did not file a petition for a new trial until January 10, 2000, which was 39 days too late.

Although Attorney Cannatelli's negligence during the First Period was unfortunate,

Francis has not met his burden of demonstrating that it amounts to an extraordinary

circumstance.  To do that, Francis needed to "show something *more* than a 'garden variety claim

of excusable neglect, such as a simple miscalculation that leads a lawyer to miss a filing

deadline.'"  *Davis v. Lempke*, 767 F. App'x 151, 153 (2d Cir. 2019) (quoting *Holland*, 560 U.S.

at 651–52).  Although they carry some persuasive force, in my view, the cases that Francis cites

as analogous are distinguishable because they regard attorney misconduct that is more blatant

and severe than Attorney Cannatelli's actions here.  In addition, as discussed below, they regard

petitioners who displayed much more diligence than Francis did.  What follows are short

summaries of the principal cases on which Francis relies.

- In *Holland v. Florida*, the Supreme Court held that an attorney's conduct "may well" have constituted gross neglect that warranted tolling the AEDPA clock.  560 U.S. at 652.  The lawyer in *Holland* had "failed to file [petitioner's] federal petition on time despite [petitioner's] many letters that repeatedly emphasized the importance of his doing so," "did not do the research necessary to find out the proper filing date, despite [petitioner's] letters that went so far as to identify the applicable legal rules," "failed to inform [petitioner] in a timely manner about the crucial fact that the Florida Supreme Court had decided his case, again despite [petitioner's] many pleas for that information," and "failed to communicate with his client over a period of years, despite various pleas from [petitioner] that [the attorney] respond to his letters."  *Id.*  The petitioner had also displayed significant diligence:  Not only had he written "his attorney numerous letters seeking crucial information and providing direction; he also repeatedly contacted the state courts, their

37

clerks, and the Florida State Bar Association in an effort to have [the attorney] . . . removed from his case." *Id.* at 653.   Further, "the *very day* that [petitioner] discovered that his AEDPA clock had expired due to [his attorney's] failings, [petitioner] prepared his own habeas petition *pro se* and promptly filed it with the District Court." *Id.*

- In *Baldayaque v. United States*, the Second Circuit held that an attorney's conduct constituted an extraordinary circumstance warranting equitably tolling AEDPA's statute of limitations.   338 F.3d at 150–53.   In *Baldayaque*, "[i]n spite of being specifically directed by his client's representatives to file a '2255,'" the lawyer "failed to file such a petition at all." *Id.* at 152.   "By refusing to do what was requested by his client on such a fundamental matter, [the lawyer] violated a basic duty of an attorney to his client." *Id.*   The lawyer also "did no legal research on Baldayaque's case," "never spoke to or met Baldayaque," and "[w]hen his letter to Baldayaque was returned, [the lawyer] made no effort to locate Baldayaque." *Id.*

- In *Maples v. Thomas*, the Supreme Court considered whether cause existed to excuse a capital inmate's procedural default in state post-conviction proceedings.   565 U.S. 266, 271 (2012).   The *Maples* Court held that cause did exist to excuse the inmate's procedural default because his *pro bono* lawyers had abandoned him:  While the inmate's post-conviction petition was pending, they left their firm, stopped representing the inmate, did not tell the inmate that their representation ceased, and did not seek to withdraw or move for substitution of counsel in the state habeas court. *See id.* at 270–71.   The inmate's time to appeal ran out because he did not learn about the state habeas court's order denying his post-conviction petition in time. *See id.* at 276–77.

- In *Dillon v. Conway*, the Second Circuit allowed a one-day-late petition to proceed even though the question was "a close one."  642 F.3d 358, 362–64 (2d Cir. 2011).   The petitioner and his lawyer spoke repeatedly about the applicable statute of limitations—"Dillon and his wife were persistent in maintaining contact with [the lawyer] to insist that he file the petition ahead of the deadline." *Id.* at 363.   Indeed, the petitioner "urged [the lawyer] not merely to file a timely petition but *specifically* to avoid the possibility of a single-day error by not waiting until the last day to file the petition." *Id.* (cleaned up).   And the lawyer repeatedly assured Dillon and his wife that he would file the petition before the deadline. *See id.* at 363–64.   The *Dillon* Court explained that the lawyer "in effect admitted affirmatively and knowingly *misleading* Dillon by promising him that he would file the petition" on time and "breached that promise when he failed to follow his client's instruction, with disastrous consequences that Dillon could neither have foreseen nor prevented." *Id.* at 364.

- In *Csanadi v. United States*, the district court ultimately held that the petitioner's habeas claim was time-barred.   2016 WL 2588162, at *8 (D.

Conn. May 4, 2016).  However, the district court "assume[d], for purposes of this motion," that some of AEDPA's limitations period had been equitably tolled because the petitioner's lawyer told him "that he was filing an appeal, but neither filed such an appeal nor notified [petitioner] that he had not done so."  *Id.* at *4.

Although Attorney Cannatelli's error in this case—he filed Francis's motion for a new trial 39 days past the one-year deadline—was lamentable, in my view it does not rise to the level of an "extraordinary circumstance."  First, the law is clear that when a lawyer is simply negligent in missing a filing deadline, that alone does not rise to the level of an "extraordinary circumstance."  *See Lempke*, 767 F. App'x at 153; *Holland*, 560 U.S. at 652 (acknowledging that an attorney who failed to file a habeas petition on time and "appears to have been unaware of the date on which the limitations period expired" may be guilty only of "simple negligence").  Construing the record in the light most favorable to Francis, Francis has possibly alleged that Attorney Cannatelli's actions amounted to *slightly* more than simple neglect.

Still, as articulated above, cases in which courts have found attorney error to rise to the level of "extraordinary circumstances" typically involve a far more specific and egregious failing.[18]  By contrast, in this case, Francis mentions only a single conversation he had with Attorney Cannatelli in late February 1999.  In addition, the substance of that conversation was quite general; for instance, Francis never claims that he asked Attorney Cannatelli to file a habeas petition on his behalf.  *See* Francis's Decl., Doc. No. 65-1, at ¶ 10 ("I instructed Attorney Cannatelli *to file an action* as soon as possible and to not let *the time* run out.") (emphases

---

[18]      For instance, in *Baldayaque*, the petitioner and his representatives specifically (and repeatedly) instructed the lawyer to file a "2255," but the lawyer never filed a habeas petition, did no legal research on the case, and never spoke with Baldayaque.  *See Baldayaque*, 338 F.3d at 152.  In *Dillon*, the petitioner specifically (and repeatedly) instructed his lawyer "not merely to file a timely petition but *specifically* to avoid the possibility of a single-day error by not waiting until the last day to file the petition."  *Dillon*, 642 F.3d at 363 (cleaned up).  And in *Holland*, the petitioner specifically (and repeatedly) asked his lawyer to file his federal habeas petition on time, going so far as to point the lawyer to the applicable legal rules, but the lawyer responded to the petitioner's correspondences with years of radio silence.  *Holland*, 560 U.S. at 652–53.

added).  Based on those facts, Attorney Cannatelli's failure to file a timely petition for a new trial was lamentable, but not extraordinary.

Even had Attorney Cannatelli's late filing constituted an "extraordinary circumstance," in my view Francis did not display reasonable diligence throughout the period that he seeks to toll. As described above, Francis describes only one conversation that he had with Attorney Cannatelli, which took place in late February 1999.  Although Francis asked Attorney Cannatelli explicitly to make a timely filing, Francis does not claim that he, at any point after that, checked on the status of any potential post-conviction filing.  In the cases on which Francis relies (described above), the petitioner repeatedly displayed concern regarding the timeliness of a particular filing and was, either himself or by proxy, in contact with his lawyer regarding the necessity of making a timely filing.  By contrast, here, Francis does not claim that he, or anyone he knew, followed up with Attorney Cannatelli at any point after late February 1999 regarding any post-conviction filing on Francis's behalf.  Francis did not act "with reasonable diligence throughout the period he seeks to toll." *McGinnis*, 208 F.3d at 17.  Thus, I will not equitably toll the 315 days between March 1, 1999 and January 10, 2000.

## IV.    Conclusion

Construing the record in the light most favorable to Francis, the AEDPA clock ran for 831 days before Francis filed a federal habeas petition in this court.  Thus, this petition is 466 days too late.  Accordingly, I **grant** the Commissioner's motion to dismiss, doc. no. 62.  The Clerk is directed to enter judgment for the respondents and to close this case.

Further, I deny a certificate of appealability.  A habeas petitioner is entitled to a certificate of appealability only if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "That is, the petitioner must demonstrate that

reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong, or that the issues presented were adequate to deserve encouragement to proceed further." *Izzo v. Sieminski*, 2009 WL 1956672, at *1 (D. Conn. July 6, 2009) (cleaned up).  In my view, Francis's petition does not present a close question about which reasonable jurists might disagree, and so I deny a certificate of appealability.

So ordered.

Dated at Bridgeport, Connecticut, this 25th day of August 2021.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge